# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| FIRST NATIONAL BANK TEXAS, | Case No. 26-cv-2243 (LMP/ECW) |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| WELLS FARGO BANK, N.A., *a national banking association d/b/a Wells Fargo Funding*, | |
| Defendant. | |

William P. Huttenbach and Gregory S. DeVries, **Crain, Caton & James, PC, Houston, TX**; and Cassandra M. Jacobsen, **Bassford Remele PA, Minneapolis, MN**, for Plaintiff.

Joelle Groshek, **Faegre Drinker Biddle & Reath LLP, Minneapolis, MN**; and Lance W. Lange, **Faegre Drinker Biddle & Reath LLP, Des Moines, IA**, for Defendant.

Plaintiff First National Bank Texas ("FNBT") brought this lawsuit against Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), alleging claims for fraud, breach of contract, and unjust enrichment. Wells Fargo moves to dismiss the complaint in its entirety for failure to state a claim. For the reasons below, Wells Fargo's motion is granted.

## BACKGROUND

On December 6, 2011, FNBT and Wells Fargo entered a contract under which FNBT would sell residential mortgage loans to Wells Fargo (the "Loan Purchase Agreement"). ECF No. 1 ¶ 5; *see generally* ECF No. 32-1. The Loan Purchase Agreement incorporates the terms of the Wells Fargo Funding Seller Guide ("Seller Guide"), which governs certain

rights and obligations of the parties relating to the Loan Purchase Agreement.  ECF No. 1 ¶¶ 5–6; *see* ECF No. 32-1 at 2; *see generally* ECF No. 33.

Relevant here, the Seller Guide contains certain "Representations, Warranties, and Covenants" that FNBT was required to make relating to any mortgages it sold to Wells Fargo.  ECF No. 33 at 4–8.  The Seller Guide provides that a breach of any of those warranties or representations by FNBT would authorize Wells Fargo to seek certain remedies, including the right to demand: (1) that FNBT "repurchase" any mortgage from Wells Fargo whose sale was found to be in breach of the Seller's Guide; or (2) that FNBT indemnify Wells Fargo for any losses Wells Fargo incurred as a result of a breach.  *Id.* at 10–12.  The Seller Guide further provides that Wells Fargo's determination as to whether a breach occurred and its "exercise of remedies, including but not limited to repurchase and indemnification," are within Wells Fargo's "sole discretion."[1]  *Id.* at 9, 11; *see also id.* at 15 ("Whenever any provision of this Seller Guide requires Wells Fargo to make a determination of fact or a decision to act, or to permit, approve or deny another party's act, such determination or decision shall be made in Wells Fargo's sole and absolute discretion.").

In March 2022, FNBT closed on a $270,000 residential mortgage loan secured by a property in Mount Pleasant, Texas, valued at $315,000 (the "Loan").  ECF No. 1 ¶ 7.  FNBT

---

[1]    Wells Fargo terminated the Loan Purchase Agreement in April 2023.  ECF No. 1 ¶ 15.  But the Seller Guide has a survival clause which states that Wells Fargo's remedies "will continue in full force and effect, notwithstanding any termination of the related Loan Purchase Agreement and th[e] Seller Guide" as to any loans previously sold by FNBT to Wells Fargo under the Loan Purchase Agreement.  ECF No. 33 at 13.

then sold the Loan to Wells Fargo on April 12, 2022. *Id.* ¶ 8. Wells Fargo did not raise any concerns about the Loan at the time and later sold the Loan to a third-party investor, Freddie Mac. *See* ECF No. 33-3 at 9; ECF No. 1 ¶¶ 8–9. In January 2024, Freddie Mac foreclosed on the Loan and sold the property for $99,662.99. ECF No. 33-3 at 9; *see* ECF No. 1 ¶ 13. FNBT was unaware of the foreclosure sale when it occurred. ECF No. 1 ¶ 13.

On January 4, 2025, Freddie Mac sent Wells Fargo a demand to repurchase the Loan, citing defects related to repairs that needed to be made to the property and an undisclosed debt of the original borrower that was not resolved before FNBT closed on the Loan. *See* ECF No. ¶ 9; ECF No. 33-3 at 9–12; ECF No. 33-1 at 2–5. On January 9, 2025, Wells Fargo sent FNBT a notice of the repurchase demand and requested that FNBT provide information regarding the defects identified, so Wells Fargo could evaluate and potentially appeal the demand. ECF No. 1 ¶ 9; ECF No. 33-1 at 2–3. The notice stated that if the information provided was deemed insufficient to rescind the repurchase demand, FNBT would need to repurchase the Loan in accordance with the Loan Purchase Agreement. ECF No. 33-1 at 2. FNBT timely responded and provided the requested information, but on March 10, 2025, Wells Fargo informed FNBT that FNBT would need to repurchase the Loan. ECF No. 1 ¶¶ 9–10.

On the morning of July 29, 2025, Anthony Gerakos, FNBT's Executive Vice President, emailed James Thompson, a Wells Fargo Credit Risk Senior Manager, to request the "transfer packet" that FNBT would "need to complete for th[e] repurchase." ECF No. 33-2 at 3; ECF No. 33-3 at 3; *see* ECF No. 1 ¶ 11. Thompson then forwarded Gerakos's email to several other Wells Fargo employees. ECF No. 33-2 at 2; ECF No. 33-3 at 2–3.

3

Kelly Sims, a Wells Fargo Analytics Consultant, responded first at 1:11 p.m. that afternoon and sent a "Service Transfer template that need[ed] to be filled out."  ECF No. 33-2 at 2; *see* ECF No. 1 ¶ 11.  Eight minutes later, Tamela Robinson, a Wells Fargo Senior Business Execution Administrator, sent a separate response to Thompson's email, copying Gerakos, which states that the "bill [was] for a make-whole, not a repurchase."  ECF No. 33-3 at 2. Robinson attached two documents to her email: (1) a "Repurchase, Indemnification, and Final Loss Analysis Invoice" ("Invoice") containing an "Indemnification Request[]" in the amount of $195,131.37, ECF No. 33-3 at 2, 6–7; *see* ECF No. 1 ¶ 11; and (2) the "Repurchase Loss Statement" Wells Fargo received from Freddie Mac relating to the Loan, ECF No. 33-3 at 2, 9–12.  FNBT completed and returned the Service Transfer document on August 13, 2025, and wired Wells Fargo the full invoice amount on August 19, 2025. ECF No. 1 ¶ 12.

FNBT emailed Wells Fargo on September 17, 2025, seeking an update on the "status of the transfer of the Loan and servicing rights back to FNBT."  *Id.* ¶ 13.  Wells Fargo responded that the payment was not for a repurchase but rather a make-whole payment for Wells Fargo's loss on the Loan.  *Id.*

FNBT filed this lawsuit against Wells Fargo on December 30, 2025.[2]  ECF No. 1. FNBT brings claims for fraud, fraudulent inducement, breach of contract, and unjust

---

[2]     FNBT initially filed the complaint in the United States District Court for the Eastern District of Texas.  Wells Fargo later moved to transfer venue to this District, which FNBT did not oppose.  ECF No. 18.  The case was transferred to this District on April 14, 2026. ECF No. 23.

4

enrichment.[3]  *Id.* ¶¶ 18–29.  FNBT seeks actual damages and punitive and exemplary damages.  *Id.* at 9.  Wells Fargo moves to dismiss FNBT's complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  ECF No. 29.

## ANALYSIS

When considering a Rule 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Brown v. Conagra Brands, Inc.*, 131 F.4th 624, 627 (8th Cir. 2025).  To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Brokken v. Hennepin County*, 140 F.4th 445, 450 (8th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## I.    FNBT's Objections to Wells Fargo's Exhibits

As a preliminary matter, FNBT objects to certain exhibits submitted by Wells Fargo in support of its motion to dismiss.  ECF No. 50 at 2.  Specifically, FNBT objects to Wells Fargo's: (1) Exhibit C (ECF Nos. 32-3, 33-1), which is a copy of the notice Wells Fargo sent FNBT on January 9, 2025; (2) Exhibit D1 (ECF Nos. 32-4, 33-2), which is a copy of

---

[3]    FNBT also brings a claim for "money had and received."  ECF No. 1 ¶¶ 30–31. Under Minnesota law, that claim is duplicative of FNBT's unjust enrichment claim.  *See Herlache v. Rucks*, 990 N.W.2d 443, 450 (Minn. 2023) (first citing *Iconoco v. Jensen Constr. Co.*, 622 F.2d 1291, 1295 (8th Cir. 1980); and then citing *Cady v. Bush*, 166 N.W.2d 358, 361 (Minn. 1969)) (explaining that "money had and received" is "unjust enrichment's historical, common-law antecedent").

the email exchange between Gerakos and Sims on July 29, 2025; and (3) Exhibit D2 (ECF Nos. 32-5, 33-3), which is a copy of the separate email exchange on July 29, 2025, between Gerakos and Robinson, including the two attachments that Robinson included in her response to Gerakos. *Id.* FNBT argues in its response brief that these exhibits "cannot be considered" because "none of them are central to FNBT's claims or referenced in the Complaint." *Id.*

It is true that courts may not consider "matters outside the pleadings" when considering a Rule 12(b)(6) motion, and if such matters "are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 688 (8th Cir. 2003) (explaining that a district court must convert a Rule 12(b)(6) motion into one for summary judgment if it considers evidence "in opposition to the pleading"). But "documents necessarily embraced by the complaint are not matters outside the pleading." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citation omitted). As such, courts may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings," *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (citation omitted), and other "matters incorporated by reference or integral to the claim" without converting the motion into one for summary judgment, *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (citation omitted).

Beginning with Exhibit C, the complaint alleges not only the existence of the January 9, 2025 notice, but also its contents. *Compare* ECF No. 1 ¶ 9, *with* ECF No. 33-1

6

at 2. The same is true of Exhibit D1. The complaint references the July 29, 2025 email exchange between Gerakos and Sims, including that Wells Fargo "provided a form of a Service Transfer Template," ECF No. 1 ¶ 11, which was attached to Sims's response to Gerakos, ECF No. 33-2 at 2. Exhibits C and D1 both are "documents whose contents are alleged in [the] complaint and whose authenticity no party questions," so the Court will consider them. *Ashanti*, 666 F.3d at 1151 (citation omitted); *see Olson v. PowerBlock, Inc.*, No. 21-cv-2713 (ECT/BRT), 2022 WL 1624888, at *1 n.1 (D. Minn. May 23, 2022) (considering emails which were "not copied verbatim in or attached to" the complaint but were "included in the [p]arties' submissions" relating to a Rule 12(b)(6) motion because the complaint contained "allegations concerning the existence and content" of the emails and none of the parties "question[ed] their authenticity").

Exhibit D2, the second thread of the July 29, 2025 email exchange in which Robinson separately responded to Thompson's email forwarding Gerakos's request for the "transfer packet." ECF No. 33-3. Robinson's email, including the attachments to the email, likewise are referenced by the complaint. For example, the complaint alleges that "[o]n July 29, 2025, FNBT received an email from [Wells Fargo] with the Repurchase and Final Loss Analysis Invoice dated July 22, 2025." ECF No. 1 ¶ 11. That document—the Invoice—was attached to Robinson's email, ECF No. 33-3 at 2, 6–7, not to Sims's email, *see* ECF No. 33-2 at 2. Therefore, the email to which that allegation refers must be Robinson's email.

The second attachment to Robinson's email—the "Repurchase Loss Statement" Wells Fargo received from Freddie Mac relating to the Loan, ECF No. 33-3 at 2, 9–12—is

7

a closer call. Specific information contained within that document is alleged in the complaint "[o]n information and belief," without express reference to the document. *Compare* ECF No. 1 ¶ 13, *with* ECF No. 33-3 at 9. Notably, none of the information contained within the "Repurchase Loss Statement" is "in opposition to the pleading" and, in fact, generally supports FNBT's factual allegations. *BJC Health Sys.*, 348 F.3d at 688. And at the hearing on Wells Fargo's motion to dismiss, FNBT acknowledged that both attachments to Robinson's email, including the "Repurchase Loss Statement," are authentic and embraced by the complaint and that the Court could consider them without converting Wells Fargo's motion into one for summary judgment.[4]

The Court therefore concludes that Wells Fargo's exhibits are embraced by the complaint and will consider them for purposes of deciding Wells Fargo's motion to dismiss. *See Ashanti*, 666 F.3d at 1151; *Miller*, 688 F.3d at 931 n.3; *Olson*, 2022 WL 1624888, at *1 n.1.

## II.    Motion To Dismiss

### A.    Breach of Contract

To state a claim for breach of contract under Minnesota law, FNBT must plead facts showing that: (1) a valid contract was formed; (2) FNBT performed any conditions precedent to its right to demand performance by Wells Fargo; and (3) Wells Fargo breached

---

[4]    FNBT nonetheless maintained at the hearing that Sims's and Robinson's emails themselves are *not* embraced by the complaint. That argument is unpersuasive for the reasons discussed above. Moreover, it would make little sense to conclude that the documents attached to Robinson's email are embraced by the complaint but not the email to which they were attached, given that FNBT expressly alleges it received the documents by email. *See* ECF No. 1 ¶ 11; *see also Olson*, 2022 WL 1624888, at *1 n.1.

the contract. *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). This claim fails because FNBT does not plausibly allege that Wells Fargo breached the Loan Purchase Agreement.

Based on FNBT's apparent belief that the payment it made to Wells Fargo in August 2025 was for a repurchase of the Loan, FNBT alleges that Wells Fargo's failure to convey the Loan to FNBT was a breach of the parties' "valid and binding contract." ECF No. 1 ¶ 26. FNBT also appears to contend that its August 2025 payment was a separate or distinct "contract" from the Loan Purchase Agreement. *See id.* But Wells Fargo's demand—whether it was for repurchase or for indemnification—was an exercise of its rights under the Loan Purchase Agreement, not a separate or standalone contract between the parties. The Seller Guide (incorporated into the Loan Purchase Agreement) expressly grants Wells Fargo the "sole and absolute discretion" to determine whether FNBT breached any of the warranties identified in the Seller Guide, ECF No. 33 at 15, which would constitute an "Event[] of Default," *id.* at 10–11. And if Wells Fargo made such a determination, it had the "right to demand [r]epurchase of the related Mortgage Loan" or to "require one or more applicable remedies," including indemnification. *Id.* at 10, 12.

Accepting the factual allegations in FNBT's complaint as true, that is precisely what Wells Fargo did. Freddie Mac demanded Wells Fargo repurchase the Loan. *See* ECF No. 1 ¶ 9; ECF No. 33-3 at 9–12. Wells Fargo then sought information from FNBT about specific defects and informed FNBT that if the information provided was insufficient to convince Freddie Mac to rescind its demand, FNBT would "be required to repurchase" the Loan. ECF No. 33-1 at 2. FNBT timely provided the requested information, but Wells Fargo

apparently was unsuccessful in its appeal to Freddie Mac and subsequently decided to require that FNBT repurchase the Loan.  ECF No. 1 ¶ 10.  Several months later, however, Wells Fargo sent the Invoice to FNBT which clearly states that Wells Fargo was making a demand for indemnification, identifying FNBT's "Required Action" as "Indemnification," the "Indem[nification] Type" as "Makewhole," and the "Total Indemnification Amount" as $195,131.37.  ECF No. 33-3 at 6; *see* ECF No. 1 ¶ 11.  Robinson also expressly clarified that the Invoice was "for a make-whole, not a repurchase." *Id.* at 2.  And FNBT identifies no provision in the Loan Purchase Agreement or Seller Guide that prohibits Wells Fargo from exercising its "sole and absolute discretion" to change its decision as to the remedy it demanded.  *See* ECF No. 33 at 15.  As a result, FNBT has not plausibly alleged that Wells Fargo breached the Loan Purchase Agreement.

FNBT attempts to escape this conclusion by arguing that Wells Fargo breached the implied covenant of good faith when it refused to convey the Loan after FNBT made the August 2025 payment.  ECF No. 50 at 7–9.  FNBT does not mention the implied covenant of good faith in its complaint, much less raise a claim for breach of that covenant, and "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989); *see Kivel v. WealthSpring Mortg. Corp.*, 398 F. Supp. 2d 1049, 1057 (D. Minn. 2005) (noting that Minnesota courts "recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing" and "would therefore require plaintiffs to separately plead their claim for breach of the implied covenant").  That said, the Minnesota Supreme Court has ruled in at least one breach of contract case that the plaintiffs "properly

stated a claim for breach of an implied covenant of good faith and fair dealing," *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 503 (Minn. 1995), even though they "concede[d] they did not plead [it] as a separate claim," *id.* at 513 (Coyne, J., dissenting).

Even if pleaded by FNBT, such a claim would fail on the merits. The implied covenant of good faith requires that "one party not 'unjustifiably hinder' the other party's performance of the contract." *Id.* at 502 (quoting *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984)). Examples of breach of the implied covenant of good faith include:

> wrongfully repudiating a contract, *Wormsbecker v. Donovan Constr. Co. of Minn.*, 76 N.W.2d 643, 650 (Minn. 1956), "avoid[ing] performance by affirmatively blocking the happening of a condition precedent," *Hennepin Cnty.*, 540 N.W.2d at 501, refusing to allow a party to perform unless the performing party waived other contractual rights, *Zobel*, 356 N.W.2d at 45–46, and using a party's rejection of an offer as a defense to contract liability when the defendant persuaded the party to reject the offer in the first place, *Nodland v. Chirpich*, 240 N.W.2d 513, 516–17 (Minn. 1976).

*Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 671 (8th Cir. 2012) (alteration in original).

FNBT does not allege that any of these things occurred here or that Wells Fargo otherwise prevented FNBT from performing under the Loan Purchase Agreement. Rather, FNBT contends that Wells Fargo exercised its rights under the Loan Purchase Agreement in bad faith when it unilaterally determined that FNBT breached its warranties under the Seller Guide and demanded indemnification because the remedies identified in the Seller Agreement purportedly were discussed only in the context of "an event of default by

11

FNBT." ECF No. 50 at 9. But that is not so: the Seller Guide expressly states that "Wells Fargo shall have available to it" various "General Remedies," including indemnification, "in the event Wells Fargo has reason to believe in its sole discretion that [FNBT] *breached the terms and conditions* of the Loan Purchase Agreement, th[e] Seller Guide *or* that an Event of Default has occurred." ECF No. 33 at 11 (emphasis added). And in any event, the Seller Guide identifies "Breach of Representation or Warranty" as a "General Event[] of Default." *Id.* at 10–11.

Although FNBT is aggrieved that Wells Fargo exercised its rights under the Loan Purchase Agreement in the inconsistent manner it did, the implied covenant of good faith and fair dealing "does not limit a party's right to act in accordance with the bargained-for terms of the agreement." *Cox*, 685 F.3d at 671 (citation modified). The Loan Purchase Agreement was "freely negotiated . . . between two sophisticated parties." *Residential Funding Co. v. Terrace Mortg. Co.*, 725 F.3d 910, 917 (8th Cir. 2013). FNBT "was not obligated to sell mortgages which did not comply with the representations and warranties in the [Seller] Guide," and Wells Fargo "obtained the ability to demand repurchase [or indemnification] if the mortgages were not in compliance." *Id.* And FNBT "made its own independent decision to enter into" the Loan Purchase Agreement knowing that Wells Fargo would have sole discretion to determine whether a breach had occurred and whether to invoke its right to demand repurchase or indemnification. *Id.* In short, Wells Fargo "did exactly what the contract allowed it to do" when it determined that FNBT breached a warranty or representation under the Seller Guide and demanded indemnification for Wells

12

Fargo's loss on the Loan. *Id.* at 918. FNBT "cannot contract away judicial review" of that determination "only to later ask a court to independently review" it. *Id.* at 915–16.

Accordingly, the Court concludes that FNBT's complaint does not state a plausible claim for breach of contract.

## B.    Fraud

Wells Fargo argues that FNBT's claims of fraud and fraudulent inducement fail in two different ways. First, Wells Fargo contends that FNBT's claims are precluded by Minnesota's "independent duty" or "economic loss" rule. ECF No. 30 at 13–14. Second, Wells Fargo argues that FNBT has not plausibly alleged reasonable reliance on any misrepresentation by Wells Fargo. ECF No. 30 at 14–17. The Court agrees with both of Wells Fargo's arguments.

### i.    Independent Duty Rule

In Minnesota, when a contract defines the relationship between two parties, "a plaintiff is not entitled to recover tort damages save for exceptional cases in which a breach of contract 'constitutes or is accompanied by an independent tort.'" *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 994 (D. Minn. 2006) (quoting *Wild v. Rarig*, 234 N.W.2d 775, 789–90 (Minn. 1975)). Relevant here, a "fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement." *AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998). A tort, such as fraud, is independent of the contract when "a relationship [between the parties] would exist which would give rise to the legal duty without enforcement of the contract promise itself." *Carlson, Inc. v.*

13

*Int'l Bus. Machs. Corp.*, No. 10-cv-3410 (JNE/TNL), 2013 WL 6007508, at \*5 (D. Minn. Nov. 13, 2013) (quoting *Hanks v. Hubbard Broad., Inc.*, 493 N.W.2d 302, 308 (Minn. Ct. App. 1992)). In other words, "what is determinative is the nature of the duties alleged to have been breached." *Id.*

Wells Fargo argues that FNBT does not allege the existence of any duty it was owed by Wells Fargo that was not both created and governed by the Loan Purchase Agreement. ECF No. 30 at 13–14. FNBT responds that its fraud claims are "distinguishable from its breach of contract claim" and that Wells Fargo "misrepresented the nature of its loan repurchase demand to FNBT, at first indicating that FNBT would be repurchasing the Loan, only to belatedly reveal after FNBT had made payment that there was no asset to convey." ECF No. 50 at 10–11. FNBT contends that this alleged misrepresentation "induced FNBT into paying Wells Fargo when it did not have to." *Id.*

FNBT's argument is unpersuasive. First, the argument relies on the faulty premise that Wells Fargo's demand for payment was somehow separate from or collateral to the Loan Purchase Agreement or Seller Guide. As already discussed, however, Wells Fargo's demand for payment was an exercise of its rights under the parties' contract; indeed, FNBT itself acknowledges that the Seller Guide conferred such rights upon Wells Fargo. *See* ECF No. 1 ¶ 6 (alleging that under the Seller Guide, Wells Fargo "had certain rights with respect to fees, future purchase demands, and other matters relating to the purchase of residential mortgages originated by FNBT"). More important, FNBT had to pay Wells Fargo under the terms of the Loan Purchase Agreement, regardless of whether Wells Fargo demanded repurchase or indemnification. And Wells Fargo's choice to demand indemnification was

14

within its "sole discretion" to make. *See* ECF No. 33 at 11. If, as FNBT argues, FNBT "would have refused to pay" had it understood Wells Fargo's demand to be for indemnification rather than repurchase, ECF No. 50 at 10–11, FNBT would have breached the Loan Purchase Agreement, *see* ECF No. 33 at 12.

FNBT also argues, again, that its "repurchase and indemnification obligations arise only in the event FNBT committed an event of default" and contends that because it "did not commit an event of default, the Seller Guide duties with respect to repurchases are not applicable." ECF No. 50 at 11. But this is merely a recasting of its argument that Wells Fargo breached the implied covenant of good faith, and it is no more persuasive here. As established, FNBT "cannot contract away judicial review" of Wells Fargo's determination that FNBT breached a warranty or representation under the Seller Guide "only to later ask a court to independently review" that determination. *Residential Funding*, 725 F.3d at 915–16.

Fundamentally, FNBT has not plausibly alleged that Wells Fargo breached any duty that would exist "without enforcement of the [Loan Purchase Agreement] itself." *Carlson, Inc.*, 2013 WL 6007508, at *5 (quoting *Hanks*, 493 N.W.2d at 308). Nor has FNBT plausibly alleged that Wells Fargo made a "misrepresentation that was outside of or collateral to the contract." *AKA Distrib. Co.*, 137 F.3d at 1086. As a result, and in accordance with the independent duty rule, FNBT cannot maintain its fraud claims as a matter of law. *See id.*; *see Target Corp. v. LCH Pavement Consultants, LLC*, No. 12-cv-1912 (JNE/JJK), 2013 WL 2470148, at *7 (D. Minn. June 7, 2013) (dismissing

fraud claims where the plaintiff failed to plead that the defendants violated a legal duty owed to the plaintiff that was independent of the contract).

### ii.    Reasonable Reliance

Even if the independent duty rule did not preclude FNBT's fraud claims, those claims still would fail because FNBT has not plausibly alleged reasonable reliance on any misrepresentation by Wells Fargo. To state a claim for either fraud or fraudulent inducement, FNBT must plead facts showing that: (1) Wells Fargo made a false representation to FNBT of a "past or existing material fact" that was "susceptible of knowledge"; (2) Wells Fargo either made the representation knowing it was false or "without knowing whether it was true or false"; (3) Wells Fargo intended to induce FNBT to "act in reliance" on the representation; (4) the representation caused FNBT to act in reliance on it; and (5) FNBT suffered damages as a result of that reliance. *ADT Sec. Servs., Inc. v. Swenson*, 276 F.R.D. 278, 294 (D. Minn. 2011) (quoting *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009)). The reliance element "is generally evaluated in the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue." *Am. Fed. Bank v. W. Cent. Ag Servs.*, 530 F. Supp. 3d 780, 789 (D. Minn. 2021) (quoting *Valspar*, 764 N.W.2d at 369). "Whether a party's reliance is reasonable is ordinarily a fact question for the jury unless the record reflects a complete failure of proof." *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 321 (Minn. 2007).

Wells Fargo argues that FNBT's fraud claims fail because FNBT's alleged reliance on Wells Fargo's initial representations that it was demanding a repurchase, not

16

indemnification, was not reasonable. ECF No. 30 at 14–17. Accepting the complaint's factual allegations as true, the Court agrees.

Upon receiving a repurchase demand from Freddie Mac, Wells Fargo asked FNBT to provide additional information about the Loan to address the defects identified by Freddie Mac. ECF No. 1 ¶ 9; ECF No. 33-1 at 2–3. At that time, Wells Fargo stated that if the information FNBT provided was deemed insufficient to rescind Freddie Mac's repurchase demand, FNBT would "be required to repurchase" the Loan. ECF No. 33-1 at 2. That turned out to be the case, evidently, and in March 2025, Wells Fargo informed FNBT that it would require FNBT to repurchase the Loan. ECF No. 1 ¶ 10. And on July 29, 2025, Gerakos emailed Wells Fargo to request the "transfer packet" that FNBT would "need to complete for th[e] repurchase." ECF No. 33-2 at 3. Sims responded at 1:11 p.m. the same day and attached a copy of the "Service Transfer template that needs to be filled out." *Id.* at 2.

Until that point, it is plausible that FNBT's reliance on Wells Fargo's representations that Wells Fargo was demanding repurchase was reasonable. The circumstances changed, however, when Robinson sent her email at 1:19 p.m. on July 29, 2025—eight minutes after Sims's email—in which Robinson stated unequivocally that the Invoice was "for a make-whole, *not a repurchase*." ECF No. 33-3 at 2 (emphasis added). Further, the Invoice, which Robinson attached to her email, explicitly and repeatedly indicates that Wells Fargo was making a demand for indemnification. *See id.* at 33-3 at 6 (identifying FNBT's "Required Action" as "Indemnification," the "Indem[nification] Type" as "Makewhole," and the "Total Indemnification Amount" as $195,131.37). Indeed, other than one time in

the Invoice's title, the word "Repurchase" does not appear anywhere else on the Invoice. *See id.* at 6–7. Upon Gerakos receiving Robinson's email with the Invoice, it was no longer reasonable for FNBT, a "sophisticated business [entity] operating in a commercial setting," to rely on the previous representations by Wells Fargo that it was demanding that FNBT repurchase the Loan.[5] *Valspar*, 764 N.W.2d at 369. Moreover, the Repurchase Loss Statement, the second attachment to Robinson's email, identified that Freddie Mac had sold the Mount Pleasant property securing the Loan in September 2024. ECF No. 33-3 (identifying $99,662.99 in sales proceeds received at the disposition of property). It is clear, then, that Wells Fargo could not reconvey the Loan to FNBT because Wells Fargo no longer had an ownership interest in the property. *See id.*

While FNBT was "not under an obligation to conduct an investigation" into any of Wells Fargo's representations, Wells Fargo's prior representations that it was demanding repurchase were "obviously false" in light of Robinson's email, the Invoice, and the Repurchase Loss Statement. *See Hoyt Props.*, 736 N.W.2d at 321. Therefore, it is not plausible that FNBT made the August 2025 payment under the belief that Wells Fargo

---

[5]     FNBT argues that "a repurchase and an indemnification are not mutually exclusive" because "indemnification simply means that Wells Fargo's losses are paid by FNBT." ECF No. 50 at 12. But the Seller Guide uses the terms "repurchase" and "indemnification" separately, indicating that they are distinct terms with different meanings even if they overlap to some degree. *See* ECF No. 33 at 10–12 (stating that "Wells Fargo has the right to demand Repurchase of the related Mortgage Loan . . . , *or* Wells Fargo may require one or more applicable remedies," which include "General Indemnification" (emphasis added)). And under Minnesota law, the Court "must construe the contract to effectuate the parties' intent" by "giving effect to all terms of the contract" and avoiding any interpretation that "renders portions of the contract superfluous or redundant." *Esanbock v. Weyerhaeuser Co.*, 367 F. Supp. 3d 925, 937 (D. Minn. 2019) (citations omitted).

"would transfer its interest in the Loan to FNBT." ECF No. 1 ¶ 12; *see Cox*, 685 F.3d at 673 (affirming dismissal of fraud claim where the plaintiffs "provided only conclusory allegations that they relied on the [defendant's] representations and were damaged 'as a direct and proximate result' of that reliance"); *see also Iqbal*, 556 U.S. at 678.

For these reasons, even if the independent duty rule did not bar FNBT's fraud claims, FNBT has not stated plausible claims of fraud and fraudulent inducement.

### C.    Unjust Enrichment

Unjust enrichment is an equitable doctrine under which "a plaintiff can recover a benefit conferred on a defendant when the defendant's retention of the benefit is not legally justifiable." *Phillips v. Caliber Home Loans, Inc.*, No. 19-cv-2711 (WMW/LIB), 2020 WL 5531588, at *4 (D. Minn. Sept. 15, 2020) (citing *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012)). To state a claim for unjust enrichment, FNBT must allege the existence of an "implied-in-law or quasi-contract," *Caldas*, 820 N.W.2d at 838, under which Wells Fargo "knowingly received or obtained something of value for which [it] in equity and good conscience should pay," *Futo v. U.S. Bancorp*, 826 F. Supp. 3d 1016, 1037 (D. Minn. 2026) (quoting *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996)). Importantly, because unjust enrichment is a claim in equity, it "'does not apply when there is an enforceable contract' governing the parties' relationship." *Id.* (quoting *Caldas*, 820 N.W.2d at 838); *see U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) ("[E]quitable relief cannot be granted where the rights of the parties are governed by a valid contract.").

19

FNBT's complaint "sets forth no plausible basis to invoke unjust enrichment because there is no dispute that the [Loan Purchase Agreement] is valid and that the conduct complained of is explicitly covered by that express contract." *Strategic Imp. Supply, LLC v. Meyers*, No. 22-cv-1699 (PJS/DJF), 2022 WL 16718673, at *2 (D. Minn. Nov. 4, 2022) (citation omitted). FNBT's unjust enrichment claim therefore fails as a matter of law. *See Futo*, 826 F. Supp. 3d at 1037–38; *U.S. Fire Ins. Co.*, 307 N.W.2d at 497.

## CONCLUSION

For these reasons, and based on all the files, records, and proceedings in this matter,

**IT IS HEREBY ORDERED** that:

1. Wells Fargo Bank, N.A.'s Motion To Dismiss (ECF No. 29) is **GRANTED**; and

2. First National Bank Texas's Complaint (ECF No. 1) is **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 31, 2026                    *s/Laura M. Provinzino*
                                        Laura M. Provinzino
                                        United States District Judge

20